DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY.

### NOVEMBER TERM, 1878.

---

BENJAMIN HUNTER, PLAINTIFF IN ERROR, AND THE
STATE OF NEW JERSEY, DEFENDANT IN ERROR.

1. A single good count in an indictment is sufficient, on error brought, to support the judgment.
2. Descriptive inconsistencies in the several counts of an indictment, with respect to the place of the death of the victim of a murder, or of the instruments used, do not show that several felonies are embraced in such indictment:. in legal intendment but a single offence is described.
3. When declarations of a third party are the natural and inartificial concomitants of an act done by him, and are explanatory of such act, and such act is a part of the *res gestœ*, such declarations are not hearsay, and are admissible.
4. A., the man afterwards murdered, made statements to his son, and wrote a note to his wife, a few hours before leaving home on the night of the murder, to the effect that he was going to the city of C. on business, and that the prisoner was going with him—*held*, such statements, both oral and written, were admissible as explanations and preparations of the act of going from home.
5. The admission of illegal testimony will not avoid a judgment on error, if it plainly appears that such testimony could not have injuriously affected the defendant on the merits of the case.

495

6. When a mortal blow is given within the jurisdiction of this state, and the death of the victim occurs within the jurisdiction of another state, the courts of this state have cognizance of the crime by force of the seventy-eighth section of the act relating to criminal procedure.

This cause came before this court by writ of error, to remove to this court the judgment of the Court of Oyer and Terminer of the county of Camden.

At the May Term, 1878, of said court, Benjamin Hunter was indicted and tried for the murder of John M. Armstrong. The jury rendered a verdict of murder in the first degree, and judgment was entered upon the verdict.

On the trial, a number of exceptions were taken to the evidence and to the charge of the court, the substance of which sufficiently appears in the opinion of the court.

For the plaintiff in error, *George M. Robeson.*

I. The first count of the indictment contains no averment of the place at which, or jurisdiction within which Armstrong died, except by inference from the place where the blow is alleged to have been given, as this is the only averment of place in the count, and this is an averment of his death in New Jersey.

II. The sixth count of the indictment contains no averment of death at all. If the averment of the time and place of death is contained in the general averment of the murder made in the count, then it is an averment of the death of Armstrong in the State of New Jersey.

III. These two counts, then, aver the death of one John M. Armstrong, who died in the State of New Jersey, but the remaining four counts of the indictment each aver the death of one John M. Armstrong, who died in the State of Pennsylvania.

This is not a different form of averment of the same crime, but the two classes of counts directly and positively aver two

different things, which are impossible to be in the same, namely, the first and sixth, the death of a John M. Armstrong, who died in the State of New Jersey; and the remaining four counts, the death of a John M. Armstrong who must have been a different person, since he died in the State of Pennsylvania. There is no word used in any of the counts to show that the same Armstrong is meant in each, but the counts are kept specially distinct, by designation in each, as one John M. Armstrong.

This shows an indictment containing two distinct charges of felony and murder done by the prisoner on two different persons; one set out and charged in the first and sixth counts, and the other in the remaining four counts of the indictment. This makes the indictment multifarious, incongruous, and bad.

IV. The prisoner was injured: because, if he was presented and put on trial for two murders, he was entitled at least to double the number of challenges.

It matters not that the state proved but one charge; if the prisoner was by it put on trial for two, he was entitled to all his rights *under both*, as his trial progressed; and to be deprived of any one of them was to be injured.

*Whart. on Cr. Law* 416; *Rex* v. *Vandercomb*, 2 *Leach C. C.* 816; *Rex* v. *Hurley*, 2 *M. & R.* 524; *Updegraff* v. *Com.*, 6 *Serg. & R.* 5; *Wash* v. *State*, 14 *Sm. & M.* 120; *Rev.*, *p.* 280, § 72.

V. The judgment in this case ought to be reversed, because John M. Armstrong, who is alleged to have been murdered by the prisoner, died out of the State of New Jersey, and in the State of Pennsylvania, and within the separate territory and exclusive jurisdiction of the said State of Pennsylvania.

Thus the death and the *crime of murder* took place out of the jurisdiction of the State of New Jersey, and within another acknowledged and exclusive jurisdiction, and so beyond the judicial knowledge and cognizance of the Court of Oyer and

Terminer of the county of Camden, to which the indictment was presented, and where the judgment was rendered.

. Under these circumstances the death could not, at common law, be inquired of by the grand jury of the county of Camden, nor the prisoner be tried for the crime of which it was an essential part, by the courts of said county.

1. Murder is defined to be the killing, with malice aforethought, by a person of discreet age and sound mind, of a human being under the peace of the state.

Murder is a complex term, denoting several facts, of which the death of the party is the most essential.

. *a.* It consists of felonious violence against a living being—which amounts to a different crime, until it is changed to. murder by the death of the victim.

*b.* The death of the victim.

The death is an essential element of the crime of murder, without which it cannot exist.

2 *Co. Inst.* 318; 1 *Hale P. C.* 426; *Bruton* v. *Morris, Hob.* 183; *United States* v. *McGill,* 4 *Dall.* 429; *S. C.,* 1 *Wash. C. C.* 465; *United States* v. *Armstrong,* 2 *Curtis* 451; *Commonwealth* v. *Parker,* 2 *Pick.* 558; *State* v. *Pauley,* 12 *Wis.* 538.

That this was a necessary constituent of the crime, is also shown by every case which holds that, where the death occurred within a different jurisdiction from the blow, the offence, as a whole, could not, at common law, be tried in the jurisdiction where the blow was struck. It was generally held that it could not be tried in *either* jurisdiction.

It was not triable where the different constituent parts happened in different counties, for the grand inquest of neither could inquire of the whole.

1 *Chitty Cr. L.* 178; 2 *Id.* 733; 1 *Hale P. C.* 651; 1 *East Cr. L.* 361.

Nor where the different parts happened within the jurisdiction of different courts, so that neither has cognizance of the whole.

*Bulwer's case,* 7 *Rep.* 2; *Constable's case,* 2 *Rep.* 93; 1 *East Cr. L.* 366; 1 *Hale P. C.* 426; 1 *Chitty Cr. L.* 180.

The death, then, is the very part of the occurrence without which the crime of murder does not happen.

It may be said that the criminal act of the murderer is complete without the death—that his part is done, and the crime, for him, complete; but such is not the law.

The question is not one of moral guilt.

When the essential parts of the crime of murder happened in different jurisdictions, there was no means of trying it, without the interference of legislative power, efficient for the purpose.

2. This was, in England, in several instances, found to be the case, and created great difficulty and inconvenience. Yet, the general jurisdiction of the English government, as claimed and asserted, covered, in each instance, by reason of jurisdiction of the places or the parties, the whole subject matter of the crime.

*a.* Thus, in the case of different counties or courts, each having jurisdiction of some part of the crime, the sovereignty of the British Empire covered all, and it needed only an expression of the legislative will to determine which county or court should have exclusive jurisdiction.

*b.* And the sovereignty was held to extend to all the provinces and dependencies, on the seas, and wherever, on account of the nature of the place or the crime, the offence would be held to be against the peace and sovereignty of all civilized nations.

*c.* It was sometimes extended, by reason of her claimed continuous sovereignty, over any one once her subject.

*d.* And the difficulties and inconveniences arising out of the internal division of her several localities, or the divided jurisdiction of her several courts, were met and disposed of as they arose, by various acts of parliament, passed for the purpose.

2 *Geo. II.* 31, etc.

3. But these acts did not attempt to arrogate to the sovereignty of the empire any new jurisdiction not before claimed, nor to create or define any new offence, but merely fixed the place of trial, or the court which should have cognizance of the offence, which already existed against English law.

Whenever the original common law definition did not cover the crime, and bring it within the claimed general jurisdiction of English law, as when committed in another jurisdiction, by a person not a subject of England, then the words of the statute, however broad, were not held to apply.

*Rex* v. *Helsham*, 4 *C. & P.* 394; *Rex* v. *Mattos*, 7 *C. & P.* 458; *Rex* v. *Depardo*, 1 *Taunt.* 26; *Reg.* v. *Lewis*, 7 *Cox C. C.* 278; *Reg.* v. *Keyn*, *L. R.*, 2 *Ex. Div.* 63; 1 *Russ. on Cr.* 553.

No state—not even the British Empire, with her claim of almost universal jurisdiction over the world of waters and the dim and distant lands that lay beyond—ever assumed to punish an offence which she did not claim to be against her own peace and sovereignty, or, what was the same thing, against the peace of the human race.

And the quality or character "against the peace of the human race" obtained only where the place was without any organized affirmative, exclusive jurisdiction, but was common to all nations.

It follows that, if the whole crime is to be punished by any government, the whole must be against the peace and sovereignty of the government punishing it.

And this may be done when the dissevered parts come together under one general sovereignty, which has power to bring them, as a whole, within one particular jurisdiction, *and has exercised that power.*

But they must all be within the *actual* or *constructive* jurisdiction of a state, to give that state power to provide for the punishment of the complete crime.

Our statute of 1797 (*Rev., p.* 282,) by Judge Paterson, was passed to reach the same point as the English statute.

4. If any essential part of the complete crime happen within another exclusive jurisdiction, the state cannot have, at common law, or take, by force of its own statutes, jurisdiction of the complete crime. Nor can its courts have judicial knowledge of the part happening within another exclusive jurisdiction.

*State* v. *Carter*, 3 *Dutcher* 499; *State* v. *Wyckoff*, 2 *Vroom* 65; *State* v. *Knight*, 1 *Taylor* 65; *People* v. *Gardner*, 2 *Johns.* 477; *State* v. *LeBlanch*, 2 *Vroom* 82.

In construing our statute, we may fairly presume that the legislature only meant to go to the limit of its power. It is a general rule of construction of statutes, that they are to be so construed as to apply only to those persons and places which are within the jurisdiction of the legislative power.

*Max. on Stat.* 123; *Reg.* v. *Keyn, supra*.

The question, as it arises between independent states, is entirely different from that between different parts of the same state.

*State* v. *LeBlanch*, 2 *Vroom* 83.

After giving to the jurisdiction of a state its largest scope ever claimed for it, we find it always limited and stopped where it reaches the boundary of another independent and exclusive jurisdiction.

The right to punish crime when committed within the jurisdiction of another state, has never been acknowledged as a right, much less claimed as an obligation.

*United States* v. *Pirates*, 5 *Wheat*. 197.

And we have never claimed it, either on foreign soil nor on the high seas, on a foreign ship, under the act of 1790. *Ch.* 36, § 12.

*United States* v. *Palmer*, 3 *Wheat*. 610; *United States* v. *Klintock*, 5 *Wheat*. 144; *United States* v. *Davis*, 2 *Sumn.* 485; *United States* v. *McGill*, 1 *Wash. C. C.* 463; *United States* v. *Jackalow*, 1 *Black* 484.

5. The language, then, of the New Jersey statute, (*Rev., p.* 282, § 78,) however broad, cannot be construed to include a crime done in any exclusive foreign jurisdiction.

The jurisdiction of our state is co-extensive with our territory, and the power of our laws extends no farther.

"Criminal laws are in their nature local, and confined in their operation within the limits of the state within which they are enacted." *State* v. *LeBlanch,* 2 *Vr.* 87.

Jurisdiction is the power of exclusive legislation. *Marshall, Ch. J., U. S.* v. *Bevans,* 3 *Wheat.* 388.

Another state cannot invade by her courts, nor by the action of her legislature, this exclusive jurisdiction, nor take judicial cognizance of a thing which happened within it.

She can no more take judicial cognizance of a part of a crime than of the whole crime—the fact is, she cannot have judicial knowledge of it for the purpose of making its establishment the foundation of her judgment.

She may, perhaps, take judicial knowledge of a part of a crime which happened outside of her own jurisdiction, if not within any other recognized exclusive jurisdiction, but only upon the ground that a crime committed upon territory common to all states, or against all states, and of consequence against her.

6. The State of New Jersey undertook, by the provisions of the statute above referred to, to remove the difficulties which at common law existed in regard to some murders which happened within her jurisdiction, actual or constructive.

Either those which happened wholly within her jurisdiction, but within different county jurisdictions, and over which she had exclusive control.

Or those, some of the constituent parts of which happened within her own territory and appropriate jurisdiction, while the other parts happened outside of her exclusive jurisdiction indeed, but yet in localities not the subject of exclusive jurisdiction of any other state, but so situated and circumstanced that, by drawing acts there happening to herself, and subjecting them to her laws, she, in so doing, would not invade or interfere with the prerogatives and exclusive jurisdiction of any other state.

This was all she could do.

The preservation intact of the separate and exclusive jurisdictions of our states is of far more consequence than the establishment of any particular crime, however cruel, or the punishment of any offender, however guilty.

For this purpose New Jersey adopted a law which had already been enacted and construed in England, and re-enacted it in the exact words.

A law which had grown out of the necessities of the British Empire, and had been enacted to cover crimes happening in some unorganized possessions of her own.

A law which had been construed by the courts of England not to cover with its broad and unrestricted terms any crime happening within a foreign jurisdiction.

*R.* v. *Lewis*, 7 *Cox C. C.* 278; *R.* v. *Mattos*, 7 *C. & P.* 458.

In providing for the difficulties within her jurisdiction, she added this provision to the same law, to provide for crimes which fell to her, because the only part which happened within the territory of any organized government happened within hers.

The language used is apt for the purpose, and not apt nor effective to extend the purview of the statute further, if she had such power, and so desired.

The words " upon the sea, or at any place out of the jurisdiction of the state," would carry no more force than is here claimed, even if the state had power for more.

The words " at any place out of the jurisdiction of the state," are qualified and restrained in construction by the words " upon the sea," and must mean, by every law of statutory construction, places *like the sea*, in their jurisdictional character and relations.

This is the construction given to this language by the court in the case of *State* v. *Carter*, 3 *Dutcher* 499—the only case in this state where this statute received a legal construction.

That this construction is right, is evidenced by the English cases cited.

That it is right, will appear from an examination of the statute itself, in the light of reason and common sense.

If any person shall be "*feloniously stricken*" upon the sea, or at any place out of the jurisdiction of this state.

If the blow was contemplated as happening within any other organized jurisdiction, who shall say that it was a *felonious blow* when it was stricken, and by what test and by what court shall that question be tried?

It may not have been *felonious* where it was struck. There may have been no such thing as *felony*, in our sense of the term, known to the law of that jurisdiction.

Again, the person giving the blow may be punishable in the jurisdiction where it was given—is he to be punished here also; and can he have the ordinary pleas of former acquittal, or punishment, or of pardon?

Again, the punishment of the blow in the jurisdiction may be different where it happened—shall its nature and its penalty change by the act of the party?

The act speaks of *such-murder*. If the blow was in a foreign jurisdiction, who shall say it was murder—what law, which code, which jurisdiction shall determine?

Again, the act speaks of the offence of *such accessory*. If his crime was committed within another jurisdiction, who shall say what his offence was, and who fix his punishment?

These difficulties arise, of course, only where the action was out of the jurisdiction; but the construction of the statute, the language and the law is the same in effect for both branches.

There can be no distinction between the alternative things presented by this statute.

They are presented in the same language, in the same clause of the same statute. The same words, descriptive of the place intended, are used in regard to both alternatives, in the same sentence, leading to the same conclusion, without change or qualification of either language or application. If the legal construction of the meaning of the words confines

their force when applied to one alternative, it must do the same when applied to the other.

The reasoning of State v. Carter must be applied to both branches of the case, for the words descriptive of locality are identical to both.

The legal meaning of the words will not be changed in the same sentence of the same clause of the same penal statute—certainly not to enlarge its scope.

Penal statutes should be confined to the narrow meaning of the statutory words, and shall not be enlarged by an alternative meaning, or take anything by implication.

*Dwarris on Stat.* 634; *Sedg. on Stat. Con.* 328; *U. S.* v. *Wiltberger,* 5 *Wheat.* 76; *Schooner Enterprise,* 1 *Paine* 33; *U. S.* v. *Winn,* 3 *Sumn.* 209; *Commonwealth* v. *Martin,* 17 *Mass.* 359.

7. It is not necessary to argue that the state could not, if she chose, by apt words and clear and unmistakable provisions, have made a *part* only of the crime of murder capital—called it murder, if she chose, and punished it with death.

The simple answer to this speculation is that she has not done so.

Our statute, like the English statute, has been held to be, was meant merely to remove such difficulties as our internal divisions of jurisdiction put in the way of the trial and punishment of crime within her jurisdiction and purview, and uses the language descriptive of the crime merely to define certain crimes already within the general power, enlarging it as far as she legally might, to include all of the class.

VI. The court below erred in admitting the declarations of John M. Armstrong, made in Philadelphia, on the afternoon of the 23d of January, to the effect that he intended to go, on that evening, to Camden, in company with Hunter, said declarations not being dying declarations, nor made in

the presence of Hunter, nor under any circumstances which made them competent as evidence in the case.

The same objection applies to a letter written to his wife, by Armstrong, on the afternoon of the said 23d of January, containing a like statement.

1 *Greenl. on Ev.* 99, 108; *Taylor's case,* 9 *Paige* 617; *Queen* v. *Hepburn,* 7 *Cranch* 295; *Lund* v. *Tyngsborough,* 9 *Cush.* 36; *Enos* v. *Tuttle,* 3 *Conn.* 250; *Kirby* v. *State,* 9 *Yerger* 382; *Wright* v. *Tatham,* 7 *A. & E.* 313; *Carter* v. *Buchanan, Kelley* 513; *Denton* v. *State,* 1 *Swan (Tenn.)* 279; *Roscoe Cr. Ev.* 22; *Castner* v. *Sliker,* 4 *Vroom* 507; *Ashmore* v. *Pennsylvania Steam Towing Co.,* 9 *Vroom* 13.

Under the general principles of law governing the admission of testimony, these declarations were utterly incompetent, because they were purely hearsay testimony.

*Greenl. on Ev.* 108.

If these declarations are to have any force by themselves, as a statement of any fact depending, for their effect, on the credit of the person making them, they are clearly inadmissible, because the fact cannot be thus proved.

They are not part of the *res gestæ* of this transaction, for the transaction had not yet commenced.

They are not part of the *res gestæ* of any transaction which had any relation to the murder, for they did not accompany and explain anything which had relation to the murder, for nothing which had relation to it was then and there transacted or carried out.

Declarations, to render them admissible in evidence, as part of the *res gestæ*, must be cotemporaneous with the main fact under consideration, to which they are intended to give character.

*Whart. Cr. L.* 680; *Denton* v. *State,* 1 *Swan (Tenn.)* 279; *Donnelly* v. *State,* 2 *Dutcher* 601.

The admission of testimony as part of the *res gestæ*, is not left merely to the discretion of the judge, but is governed by principles of law, to be applied to the circumstances of the particular case, in the exercise of judicial judgment. Errors

of judgment, in such cases, may be examined and corrected, as in all other applications of legal principles. If it were not so, there could be no fixed rule of principle governing the admission of testimony.

For the state, *Richard S. Jenkins.*

The plaintiff assigns error to the indictment—

To the first count.—In that it contains no averment of the place where John M. Armstrong died of the mortal wound, in the said count alleged to have been given by the said Benjamin Hunter.

To the second count.—In that it avers that Armstrong died in the city of Philadelphia, in the State of Pennsylvania, a place outside of the jurisdiction of the court to which the indictment was presented, and contains no other allegation of the place of death; and that the judgment given thereon, against Hunter, is contrary to the law of the land.

To the third, fourth and fifth counts.—In that they each aver the death of John M. Armstrong at a certain place out of the jurisdiction of the state and the court, and within the jurisdiction of the State of Pennsylvania; and that the judgment given thereon, against Hunter, is contrary to the law of the land.

To the whole indictment.—In that the only definite and specific averment of the death of Armstrong locates the death at a place out of the jurisdiction of the state and the court to which the indictment was presented, to wit, at Philadelphia, in the State of Pennsylvania.

In that the first and sixth counts charge Hunter with the murder of a certain John M. Armstrong, in the city of Camden and State of New Jersey, within the jurisdiction of the said court; and the second, third, fourth and fifth counts charge Hunter with the murder of one John M. Armstrong, who in each of said counts is averred to have died in Philadelphia, a place within the jurisdiction of the State of Pennsylvania, and out of the jurisdiction of this state. The said

indictment being thus, in the several counts, incongruous and inconsistent, containing charges against the prisoner that could not be entertained and tried in the said court, and containing charges and averments against Hunter, in the same indictment, of two separate felonies and murders.

And in that it charges Hunter with the murder of Armstrong, who, in fact, died within the jurisdiction of the State of Pennsylvania, and out of the jurisdiction of the state and the court to which the indictment was presented.

And that the judgment given in the said indictment is contrary to the law of the land.

I do not propose to reply to these assignments of error *seriatim*. I submit for the consideration of the court two propositions, which will comprehend in their discussion, it seems to me, nearly everything that need be said upon this branch of the case.

*First.* That it is an undoubted rule of law, at the present time, that if one count in an indictment be good, it will be sufficient to sustain a general verdict of guilty, although all the other counts are defective.

*Second.* That as there is nothing in the constitution of the United States, the laws of nations, or the constitution of this state, to restrain the legislature from enacting such a statute as that now in question, (*Crim. Pro.*, § 78,) an indictment properly framed upon such statute is unassailable, and a conviction in due form of law upon such an indictment cannot legally and properly be set aside.

And lest I should be understood as conceding that some of the counts of the indictment in question are defective, let me here say that if the sixth count is good pleading, the error assigned as well to it as to the first count, is untenable.

This sixth count is framed upon the forty-fifth section of our criminal procedure act, and our act is an exact copy of the present English statute. *Stat.* 14 *and* 15 *Vict., ch.* 100, § 4. See 2 *Arch. Cr. Prac. and Pl.*, ed. 1853, *p.* 206, *note* 1.

A similar statute has been introduced into at least three other of the United States—Wisconsin, Maine and New

Hampshire; and in two of these states it has been made the subject matter of judicial interpretation. *Rowan* v. *State*, 30 *Wis.* 139; *State* v. *Verril*, 54 *Maine* 408.

But to return to the discussion of my first proposition. "Every cautious pleader," says Mr. Wharton in his work on criminal law, (1 *Whart. Am. Cr. L.*, § 424,) "will insert as many counts as will be necessary to provide for every possible contingency in the evidence, and this the law permits."

An indictment may contain two or more counts alleging distinct offences if they are of the same general description, and the mode of trial and the nature of the punishment is the same. *Com.* v. *Costello*, 120 *Mass.* 358; *Carlton* v. *Com.*, 5 *Met.* 532; *Booth* v. *Com.*, 5 *Met.* 535; *Com.* v. *Cain*, 102 *Mass.* 487; *Com.* v. *Sullivan*, 104 *Mass.* 552; *Miller* v. *State*, 25 *Wis.* 384; *State* v. *Wishon*, 15 *Miss.* 503; *Com.* v. *Desmarteau*, 16 *Gray* 1; *Com.* v. *Brown*, 121 *Mass.* 69; *State* v. *Wright*, 53 *Maine* 328; *Shannon* v. *People*, 5 *Mich.* 71; *State* v. *Hood*, 51 *Maine* 363; 1 *Bish. Crim. Pro.* 147, *note* 3; *Id.* 148, *note* 4.

And the right of election in this country, if not in England, is confined to cases where the indictment contains charges which are actually distinct, and grow out of different transactions, (1 *Whart. Am. Cr. L.*, § 423,) "such elections in felonies will not be required to be made where several counts are introduced solely for the purpose of meeting the evidence as it may transpire, the charges being substantially for the same offence. *Kane* v. *People*, 8 *Wend.* 203; *Com.* v. *Hills*, 10 *Cush.* 530; *People* v. *Thompson*, 28 *Cal.* 214; *Donnelly* v. *State*, 2 *Dutcher* 463, 601; *State* v. *Gummer*, 22 *Wis.* 441; *Miller* v. *State*, 25 *Wis.* 384; *State* v. *Miller*, 34 *Conn.* 298; *Armstrong* v. *People*, 70 *N. Y.* 38.

For in such case the joinder of counts cannot prejudice the defendant, which is the only ground on which this application to the discretion of the court can be founded to make the prosecutor elect. And whether a court will compel a prosecuting officer to elect which count to proceed on, rests in the

discretion of the court, and cannot be assigned for error. 1 *Whart. Am. Cr. L.*, ed. 1874, *p.* 331, and cases cited in note G[1].

. In *Stone* v. *State, Spenc.* 404, it was held, (as in my proposition,) if one count in an indictment be good, it will be sufficient to sustain a general verdict of guilty, although all the other counts are defective, and Mr. Justice Carpenter, in delivering the opinion of the court, says: " I have been unable to find any case, or even *dictum*, in which this well-settled principle has been denied, or even doubted." See, also, *State* v. *Mayberry*, 48 *Maine* 238 ; *State* v. *Burke*, 38 *Maine* 574 ; *State* v. *Hadlock*, 1 *Maine* 282 ; *State* v. *Wright*, 53 *Maine* 328 ; *Rice* v. *State*, 3 *Heisk.* (*Tenn.*) 215.

. And as to my second proposition, I state it as a proposition of law, that the jurisdiction of the State of New Jersey is co-extensive with the legislative powers of the state. The rule in construing a state constitution is, that the legislature possesses plenary powers unrestricted, except by the instrument itself, and that the presumption is in favor of the validity of a peculiar statute, until it plainly appears from the constitution itself, that the legislature had no power to pass it. *Commonwealth* v. *Mc Williams*, 11 *Penn. St.* 61 ; *People* v. *Collins*, 3 *Mich.* 348, 349, 359, per Green, J. ; *Id.* 404, 405, per Martin, J. ; *People* v. *Draper*, 15 *N. Y.* 533, 543, 545, per Denio, C. J. ; *Sears* v. *Cottrell*, 5 *Mich.* 256 ; *State, ex rel. Chandler*, v. *Main*, 16 *Wis.* 398 ; *United States* v. *Bevans*, 3 *Wheat.* 336.

I insist upon it as a fact, to which I challenge disproof, that there is nothing in the constitution of the United States, the laws of nations, or the constitution of this state, to restrain the legislature from enacting such a statute as that now in question. And a careful analysis of this statute will demonstrate, I submit, that an indictment properly framed upon it cannot be legally and successfully assailed, nor a conviction had under it in due form of law, be properly set aside.

It was long doubtful, where the mortal stroke and death were in different counties—and, by parity of reasoning, in differ-

ent countries—whether the offender could be indicted at all, of murder, for the reason that the offence was not complete in either. *Hale P. C.* 426 ; 1 *Hawk. P. C., ch.* 31, § 13 ; *Id., ch.* 25, § 36 ; 1 *East P. C., ch.* 5, § 128 ; 4 *Black. Com.* *303 ; *Bac. Abr.,* "*Indictment," F.*

As early as the reign of Edward VI., before the settlement. of this country, the parliament of Great Britain, to obviate the defeat of justice which these doubts might occasion, enacted the statute of 2 *and* 3 *Edw. VI., ch.* 24.

This statute begins with declaring : " For as much as the most necessary office and duty of law is to preserve and save the life of man, and condignly to punish such persons that unlawfully and wilfully murder, slay, or destroy men." And, after reciting that where the stroke and death are in different counties : " In such case, it hath not been found by the laws or customs of this realm, that any such indictment thereof can be taken in either of the said two counties." It then enacts the said statute : " For redress and punishment of which offences and safeguard of man's life," &c.

Again, in 1729, the parliament of Great Britain passed the statute of 2 *Geo. II., ch.* 21—cited in 1 *East P. C., ch.* 5, § 131—declared to be " for preventing any failure of justice, and taking away all doubts touching the trial of murders in the cases hereinafter mentioned."

Upon these two English statutes, enacted as aforesaid, " for redress and punishment," " safeguard of man's life," and for " taking away all doubts touching the trial of murders," the act of March 7th, 1797, which constitutes sections seventy-six, seventy-seven, and seventy-eight of our criminal procedure act, is founded.

This act of March 7th, 1797, is entitled " An act concerning the trial of murder in cases where the stroke and death happen in different counties, and in cases where either the stroke or death only happens within this state," and may be found in the pamphlet laws of the twenty-first general assembly of the State of New Jersey, page 207, and in *Pat. Rev.,* pp. 248, 249.

The first and second sections of this act are modeled after the statutes of 2 *and* 3 *Edw. VI., ch.* 24, §§ 2, 4, and are almost *in hœc verba.* The third section is the statute of 2 *Geo. II., ch.* 21.

This third section constitutes the seventy-eighth section of .our criminal procedure act, upon which the indictment and the proceedings in question were founded and had.

Through all the several revisions of our laws, comprehending a period of time over three-quarters of a century, this statute—*Crim. Pro.,* § 78—has remained, *verbatim et literatim,* unchanged upon our statute book; and if the construction to be put upon it is to be made consonant with the well settled rules of law, rather than the unauthorized *dicta* of counsel, its meaning is clear beyond all possibility of mistake.

1. Look, for example, at the words. Could language be more clear, more plain? "Where any person shall he feloniously stricken or poisoned, within the jurisdiction of this state"—the limits of the state having been authoritatively ascertained, "within the jurisdiction" of it is sufficiently comprehensive—"and shall die of such stroke or poisoning, upon the sea, or"—mark the words, not generally "out of the jurisdiction of this state," but—"at any place out of the jurisdiction of this state, in either of the said cases, an indictment thereof, found by jurors of the county within the jurisdiction of this state, in which such death-stroke or poisoning shall happen, respectively as aforesaid," &c., "shall be as good," &c.

II. Look at the context. While the subject matter of the first and second sections of this act of March 7th, 1797— *Crim. Pro.,* §§ 76, 77—was, in fact, a part of the common law of the State of New Jersey at the time of the passage of the act, the subject matter of the third section—*Crim. Pro.,* § 78—was not then a part of our common law, because the statute of 2 *Geo. II., ch.* 21, was restricted, in its operation, to "that part of Great Britain called England." How significant, then, in its interpretation, is the connection of this third section with the first and second, all, together, constituting one legislative act, the first and second sections

providing for the punishment of principal and accessory to murder, where the death and stroke were in different counties within the state, and the third section providing, in like manner, where the death or stroke was on the high seas, or at any place outside of the jurisdiction of the state.

III. Again, if it is to be interpreted by its subject matter, this is easily discernible. Only turn to the original act of March 7th, 1797, in the pamphlet laws above cited. Its title (and titles to acts in those days were honest and comprehensive,) describes it (*inter alia*) as "An act concerning the trial of murder" " in cases where either the stroke or death only happens with this state." And the marginal syllabus of section three, contemporaneous with the adoption of the act, reads : " Indictment may be found where the death, stroke, or poisoning shall happen."

And other foreign jurisdictions have statutes in substance similar to our own statute in question ; and in the absence of any authoritative interpretation by our own courts, their construction becomes important.

I have already referred to the kingdom of Great Britain. Ever since the enactment of 2 *Geo. II.*, *ch.* 21, a similar statute has been upon the English statute book ; such statute having been re-enacted in 9 *Geo. IV.*, *ch.* 31, § 8, and in 24 *and* 25 *Vict.*, *ch.* 100, § 10. Never in all that time has the legality or constitutionality of this statute been seriously questioned, and in all the cases which I have been able to find and examine, a similar interpretation has been placed upon the law to that now claimed by this state.

In *Reg.* v. *Azzopardi*, 1 *C. & K.* 203, it was held that a British subject who commits a murder in a foreign country upon a person who was not a British subject, is triable in England.

In *Rex* v. *Helsham*, 4 *C. & P.* 394, the prisoner was indicted and tried in England for killing Lieutenant Crowther, at Boulogne.

Indeed, the English cases, while they differ in a measure as to the application of this law to foreigners not British subjects,

all concur in this, that the law thus construed is necessary to prevent a defeat of justice, which without it might have arisen from the difficulty of trial in cases of homicide when the death occurs in a different place from that at which the blow causing it was given.

See the opinion of Mr. Justice Willis in *Reg.* v. *Lewis, Cox C. C.* 277.

I find the following statutes substantially similar to our own upon the statute books of the following states : Maine—*Rev. of Maine,* 1857, *ch.* 131, *p.* 700, § 3 ; Massachusetts—*Stat. of Mass.,* 1860, *p.* 838, § 19 ; Delaware—*Rev. Code,* 1852, as amended, &c., 1874, *ch.* 127, *p.* 765, §§ 3, 5 ; Virginia— *Code of Va.,* 1873, *p.* 1189, § 6 ; West Virginia—*Code of W. Va.,* 1868, *p.* 678, § 6 ; Alabama—*Code of Ala.,* 1876, *ch.* 2, *p.* 963, § 4634 ; Tennessee—*Stat. of Tenn.,* 2 *Thompson & Styer,* § 4974 ; Illinois—*Rev.* 1877, *p.* 402, §§ 398, 401 ; Ohio —*Act of March 7th,* 1835, *S. & C.* 401 ; Missouri—2 *Wagner's Missouri Stat., p.* 1088, §§ 15, 16 ; Michigan—2 *Compiled Laws of Mich., p.* 1566, § 5944 ; Wisconsin—2 *Taylor Stat. of Wis.,* 1871, 1904 ; Colorado—*Gen'l Laws State of Colorado,* 1877, *chs.* 24, 265.

And in some of these states this statute has been made the subject of judicial interpretation. I have been able to find but one case in the United States in which a different doctrine was enunciated to our own at bar. That was the case of *Com.* v. *Linton,* 2 *Va. Cas.* 205, in which it was held that if a person be stabbed in Virginia and die of his wounds in another state, he could not be tried for the murder in any county in Virginia, which was perfectly good law at the time the decision was rendered, there being then no special statutory provision for such cases. Since then, however, Virginia has adopted the statute to which I have previously referred, and *Com. v.* Linton has ceased to be good law, even in that state.

In the case of *Com.* v. *Macloon et al.,* 101 *Mass.* 1, this question was thoroughly discussed. The direct point of inquiry was, whether under the general statute (*ch.* 171, § 19,) of

Massachusetts, providing for the punishment of causing death within the state by means of a mortal wound given, or other violence or injury inflicted without the state, a conviction might be had. for causing death by exposure or starvation. The question of jurisdiction was raised, and Justice Gray, in an elaborate and exhaustive opinion, decided that the state had jurisdiction.

In *Com.* v. *Parker*, 2 *Pick.* 549, the question was whether, when the cause of death happens in one county, and the death in another, an indictment thereof might be found in the latter and not be repugnant to the declaration in the constitution, that in criminal prosecutions the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, &c., of the citizen. Chief Justice Parker devotes the larger portion of his opinion to the consideration of the power of the legislature to enact this and similar laws, and concludes that "surely an act of the legislature which removes all doubt as to the place of trial, by designating the county in which the death happened, is in no respect a violation of the spirit, or even the letter, of the constitution."

*State* v. *Pauley*, 12 *Wis.* 537, was a case in which the blow was struck in one county and the death occurred in another; the question of jurisdiction was raised, and the right of the legislature to enact the statute involved, and similar statutes, was discussed and conceded.

So, also, a similar question was considered, and the same result arrived at, in *Riley* v. *State*, 9 *Humph.* 646.

*Tyler* v. *The People*, 8 *Mich.* 321, was a case in which the blow was struck upon a river of the then province of Canada, and the death occurred in a county of the State of Michigan. It was held by the majority of the court that Michigan, under the statute, had jurisdiction of this case.

In the case of *Steerman* v. *State*, 10 *Mo.* 503, which was a trial of larceny in the State of Missouri, under a special statute, committed on a vessel in the course of a voyage, Justice McBride says, in delivering the opinion of the court, "Where a mortal wound shall have been inflicted in one county, and

death ensues in another, the indictment, trial, etc., may be had in either county; and where the wound is inflicted in another state, and death takes place in this state, the indictment ·may be found in the county where the death happened."

*State* v. *Carter*, 3 *Dutcher* 499, is referred to, and relied upon, by the plaintiff as being in contravention of the interpretation of the law by the court below. This was an indictment charging a felonious assault and battery in New York, and that the party injured came into and died from its effects in New Jersey, which was held to charge no crime against this state. But neither the principle involved in that case, nor the *obiter dicta* of the learned justice, appertain to, or fit, this case. "If the acts charged in that indictment," Justice Vredenburgh says, " be criminal in New Jersey, it must be either by force of some statute, or upon general principles. There is no statute, unless it be the act to be found in *Nix. Dig., ch.* 3," (which is section seventy-eight of our criminal procedure and the act now in question;) "but this evidently relates to murder only, and not to manslaughter."

I submit, then, that in the absence of any reliable case, either in this country or Great Britain, antagonistic to the view adopted and expressed by the court below, and in the presence, to the contrary, of the cases in Great Britain and our several states, above cited, this court will not undertake to say that this law in question, which we find upon the statute book of one of our oldest states (Massachusetts), as well as of one of our youngest (Colorado)—a law which Great Britain has had, with a slight interruption, for nearly two centuries, and some of our states for well nigh a century—which fourteen at least of our states have thought it necessary to adopt, and which four of them, through their highest judicial tribunals, have directly or indirectly endorsed and sustained—I say, in view of all this, I submit that this court will not pronounce this law inoperative, but will, in like manner with other of our states, endorse and sustain the interpretation of the court below.

Every consideration of public policy should induce your

arrival at such a conclusion. Contemplate what immunity to crime would result from this statute being made a dead letter.

What a trade could be driven by the poisoner, who would only have to devise means to administer the noxious drug in New Jersey and send his dupe elsewhere for the slow, but sure, death to ensue. How easy it will be for the assassin to deal the fatal blow on our own soil and then transport his unconscious victim over the neighboring boundary line to languish and die.

And then, to prevent the defeat of justice, must the state keep hold of the injured party within its jurisdiction, for the space of a year and a day, in spite, it may be, of the hope expressed by the medical expert, that the waters of Bedford or Saratoga, or the breezes of Newport or the Isle of Shoals, or the experience of the hospitals of Philadelphia or New York, might possibly effect a cure, how desperate soever the case might be?

The assignment of errors to the admission of the testimony of Frank L. Armstrong, relating to the statements of John M. Armstrong, as to where he was going on the evening of the day of the murder, and with whom and for what purpose; to the admission of the testimony of William L. Donnell, relating substantially to the same matter; and to the admission of the testimony of Julia Armstrong in reference to the receipt by her, about seven o'clock of the evening of the murder, of a letter of Armstrong's, sent to her by the hands of Stephen H. Carey, and to the admission of said letter, may all properly be considered together.

All this testimony was offered and admitted at the trial below as falling under the well settled rules of evidence relating to the *res gestæ*. As to the general principles of law relating to the *res gestæ*, see 1 *Whart. Law of Ev.*, § 259; 1 *Greenl. on Ev.*, §§ 108, 110; 1 *Phil. on Ev.*, *185, and notes.

The following cases have a bearing, more or less direct, upon the case now before the court: *Handy and Tull* v. *Johnson*, 5 *Ind.* 450; *Mitcham* v. *State*, 11 *Ga.* 615; *Riggs* v. *State*, 6 *Coldw.* (*Tenn.*) 517; *Elkens* v. *Hamilton* 20 *Ver.* 627;

*Hamilton* v. *State*, 36 *Ind.* 280 ; *State* v. *Garrand*, 5 *Oregon* 216 ; *Rollins* v. *Stout*, 6 *Nev.* 151 ; *Autauga County* v. *Davis*, 32 *Ala.* 703 ; *Pitts* v. *Burroughs*, 6 *Ala.* 733 ; *State* v. *Howard*, 33 *Ver.* 380 ; *Reg.* v. *Christopher Edwards*, 12 *Cox C. C.* 230 ; *Meek and Thornton's Ex'rs* v. *Perry and wife*, 36 *Miss.* 261 ; *West* v. *Price's heirs, J. J. Marsh.* 380 ; *Enos* v. *Tuttle*, 3 *Conn.* 250 ; *Prof. Webster's case ;* *Russel* v. *Frisbee*, 19 *Conn.* 206.

The plaintiff also assigns error to the testimony of Joseph Ashbrook relating to a statement made by Armstrong at the time he made application for, and procured, a certain policy of insurance through said Ashbrook, to the effect that he (Armstrong) had not been ruptured.

The testimony of Joseph Ashbrook reveals the fact that he was asked the following questions, among others, in cross-examination by Mr. Thompson, one of Hunter's counsel :

*Q.* Then when he came out of the examining room he had been in the office of the physician ?

*A.* Yes, sir.

*Q.* And had passed ?

*A.* Yes, sir ; he had passed.

*Q.* And then you had the conversation with him ?

*A.* Yes, sir.

*Q.* What was said then ?

I submit that the defence having themselves introduced this conversation, the state had a right to have the whole of it, that is to say, to prove everything that was then and there said. And if Armstrong was then and there asked the question whether he was ruptured, and replied to it, I hold that we are entitled to it as a part of the conversation.    2 *Whart. Law of Ev.*, § 1103.

Error is also assigned to the admission as a witness for the state of Lydia Graham, wife of one Thomas Graham, said. Thomas having been by his own confession, " cognizant of, present at, and a party to," the murder of Armstrong, and having been indicted also for said murder in a separate indictment, which then remained untried and undisposed of.

The testimony of Mrs. Graham, offered by the state, was confined to a recital of certain meetings between herself and Hunter, before the murder, at which Hunter inquired for Tom (her husband), and at one of which he said he was going to get Tom work.

Where, upon a joint indictment, there is a separate trial, the husband or wife of the defendant not upon trial is not necessarily an incompetent witness for the state. 1 *Phil. on Ev.* *84; 1 *Best on Ev.* *247; 1 *Greenl. on Ev.,* § 342; 1 *Whart. Am. Cr. L.,* § 768.

In *Wexon* v. *The People,* 5 *Park. Cr. R.* 119, it was held that where on a criminal trial one of the defendants is a competent witness on behalf of the people, the wife of such defendant is also a competent witness.

In *Den, ex dem. Stewart,* v. *Johnson,* 3 *Harr.* 94, and in *State* v. *Wilson and Wagner,* 2 *Vr.* 77, it was held that the evidence of a husband or wife as witnesses to affect the other, " to be inadmissible must *charge a crime."*

In the case of *Ware* v. *State,* 6 *Vr.* 554, the rule laid down in Den *v.* Johnson, and State *v.* Wilson and Wagner, was recognized and adopted, and the judgment of the court below was reversed and a new trial awarded, on account of the exclusion of the testimony of a husband that the reputation of his wife for truth and veracity was bad in the neighborhood, said testimony tending to disgrace but not to charge her with a criminal offence.

Error is also assigned to the admission of the testimony of Joseph C. Nichols, in reference to a statement made in his presence by Hunter on the night of his arrest, and to the admission of a letter purporting to have been written by Hunter to Armstrong in relation to certain policies of insurance upon Armstrong's life.

It is too well settled for comment that a voluntary statement made by a defendant, without the appliances of hope or fear, is always admissible against him. 1 *Greenl. on Ev.* 248; *Id.* 249, 250, *note; Id.* 253; *Roscoe's Cr. Ev.* 41, 42, *note;* 1 *Arch. Cr. Prac. and Pl.* 125, *note;* 1 *Whart. Am. Cr. L.,*

§ 683, *note; Id.,* § 690 ; *Walker* v. *State,* 49 *Ala.* 398 ; *Morrissey* v. *People,* 11 *Mich.* 575.

. *John P. Stockton, Attorney-General,* on same side.

The assignment of errors are twenty-five in number. By classifying the general and formal assignments under the first head, we can resolve the whole of them into three propositions, viz.:

I. Whether the Oyer and Terminer of the county of Camden has jurisdiction where a person is *feloniously stricken* in Camden, and death thereby ensues in Pennsylvania.

II. Whether the letter and declarations of the deceased and the letter of the defendant were admissible.

III. Whether the testimony of the wife of Thomas Graham, an accomplice, was admissible to corroborate her husband.

The first proposition to consider is :

1. Whether the Oyer and Terminer of the county of Camden has jurisdiction where a person is feloniously stricken in Camden, and death thereby ensues in Pennsylvania.

The verdict is general, and one good count is sufficient to sustain it. *Stone* v. *State, Spencer* 404; *West* v. *State,* 2 *Zab.* 213; *Cook* v. *State,* 4 *Zab.* 843; *Johnson* v. *State,* 5 *Dutcher* 453; *State* v. *Cooper,* 1 *Green* 362; *State* v. *Ross,* 2 *Dutcher* 224; *Crim. Pro. Act,* § 45.

The application for election is always to the discretion of the court, and is only allowed when the joinder may prejudice the defendant. 1 *Whart. Cr. L.,* § 422.

The right of election in this country, if not in England, is confined to cases which are actually distinct, and which grow out of different transactions. 1 *Whart. Cr. L.,* § 423, and cases cited in notes A and B.

Whether the court will compel a prosecuting officer to elect

rests in the discretion of the court, and cannot be assigned for error.   1 *Whart. Cr. L.* 423, note G¹, and cases cited; *State* v. *Jones,* 5 *Ala.* 666; *State* v. *Flye,* 26 *Me.* 312; *United States* v. *Dickerson,* 2 *McLean* 325; *McGregg* v. *State,* 4 *Blackf.* 101; *State* v. *Davis,* 29 *Mo.* 391; *People* v. *Shotwell,* 27 *Cal.* 394; *State* v. *Hogan, R. M. Charlton* (*Geo.*) 474; *Weinzorpflin* v. *State,* 7 *Blackf.* 186; *Strawhern* v. *State,* 37 *Miss.* 422; *State* v. *Nelson,* 14 *Rich. S. C.* 169.

Where the prosecutor charges one offence, though it is stated in several counts, he cannot be required to elect.   *State* v. *Canterbury,* 28 *N. H.* 195; *State* v. *Jackson,* 17 *Mo.* 544; *People* v. *Austin,* 1 *Parker Cr. Cas.* 154.

The rule in England is, that the same act may be charged as a different offence in different counts.   *Leach* 568; *Thompson's case, East P. C.* 515;

So, where the indictment was for petty treason and murder, it was held good.   *Leach* 512; *Foster's Cr. L.* 106, 328; 10 *State Tr.* 36; 1 *Starkie Cr. L.* 39, 40.

So burglary may be laid with larceny to the amount of forty shillings.

On an indictment for murder, a man may be convicted of manslaughter.

Under the laws of this state, a party indicted for crime may be convicted of any offence of a lower degree, provided such lower offence is included within the description in the indictment, without regard to the question whether it was or was not technically a felony.   *State* v. *Johnson,* 1 *Vroom* 185.

In Donnelly's case the indictment for murder contained four counts, each charging the mortal wound to have been made with a different instrument, and varied the description of the injury charged to have been inflicted; and it was held good—the four counts charged but *one offence,* the mode of death being substantially the same.

The whole offence is charged to have occurred in the body of the county of Camden, against the peace of the state; where the death occurred is immaterial—that is but the con-

sequence. That the offence must have occurred within the body of the county is clear.

Where the stroke and death were in different counties, it was doubtful, at common law, whether the offender could be indicted at all, the offence not being complete in either, though the more common opinion was that he might be indicted where the stroke was given, for that alone was the act of the party, and the death is but a consequence, and might be found in another county, and the body removed into the county where the stroke was given. 1 *East Cr. L.* 361, § 128.

The rule is that every offence must be in violation of the sovereignty which charges it.

So in England, in a murder, where the act was committed in one county and the death occurred in another, the question whether the county where the act was done, or in which the consequence ensued, had jurisdiction, was a question dependent only on the circumstance which grand jurors—from the body of which county—had cognizance. And the same question arose between the adjoining counties of Wales and England. This was a question within the control of parliament, which they settled. But it must be observed that in all those cases the offences were against the crown of Great Britain.

The acts of 2 *and* 3 *Edw. VI.* were passed to remedy the failure of justice where the death and stroke occurred in different counties, and that of 2 *Geo. II.*, (1 *East Cr. L.* 376,) where the stroke was at sea or out of England, and the death in a county, or *vicè versa;* still the latter provided only for cases where it was the sovereignty of Great Britain that was violated.

Our statute passed March 7th, 1797, (*Rev. Stat., p.* 297 ; *Nix. Dig.* 222 ; *Paterson, p.* 248 ; *Rev., p.* 282, § 78,) is a copy of 2 *Geo. II.*, with immaterial alterations, our statute substituting the expression " out of the jurisdiction of the state " for the words " out of that part of Great Britain called England." It did not refer to crimes against the law of other nations.

In Rex *v.* Anderson it was ruled by all the judges that a

felon could not be indicted in Cumberland, in which county he was taken with goods, where the original taking was in Scotland, otherwise between the counties of England. At the time of this decision, Scotland, though a part of the British dominions, was a distinct kingdom, so far as concerned her criminal law. *State* v. *LeBlanch,* 2 *Vroom* 85.

So when this question arose in our own state, in the case of *State* v. *Carter,* 3 *Dutcher* 499, it was held that an indictment charging a felonious assault and battery in New York, and that the party injured came into and died from its effects in New Jersey, charges no crime against this state.

That any statute making criminal acts done wholly in another sovereignty was necessarily void. But Judge Vredenburgh, in the opinion of the court, sustains the converse of the proposition, approving the statute so far as it is applicable to our form of government, so far as it applies to the criminal procedure of New Jersey. He says: " It is said that if we do not take jurisdiction, the defendant will go unpunished, inasmuch as the party injured not dying in New York, he could not be guilty of murder there. But New York may provide by law for such cases ; and, if she does not, it is their fault, and not ours. The act done is against her sovereignty, and if she does not choose to avenge it, it is not for us to step in and do it for them."

It is universally conceded that criminal laws are in their nature local, and in their operation are confined within the limits of the state in which they are enacted. The flag may indeed, under the doctrine of extra-territoriality, extend the area over which the criminal law of a state extends, but this exception only proves the rule.

State *v.* Carter is approved of by Chief Justice Beasley, in *State* v. *Wikoff,* 2 *Vroom* 67, where the cases are reviewed, showing that crime may be committed against the laws of a state without personal presence within the jurisdiction. But the question always is against what sovereignty the crime was committed. *State* v. *Knight, Taylor (N. C.)* 65.

The legislature has provided that where any person shall

be feloniously stricken within the jurisdiction of this state, and shall die of such stroke outside of the jurisdiction of this state, an indictment found by jurors of the county of this state in which such stroke shall happen—whether it shall be found before the coroner, on view of the body, or not—shall be good and effectual.

This is the language of the third section of the act, stripped of the converse of the proposition. Its title is, "An act concerning the trial of murder in cases where the stroke and death happen in different counties, and in cases where either the stroke or death only happens within this state."

Many other states of the Union have substantially so provided. The parliament of Great Britain has so provided. Ancient forms of indictments have been framed upon such legislation, since the time of Edward VI. Innumerable cases have held it competent for the supreme legislative power so to provide. It is believed there is no case where the power has been denied.

The act, as its title denotes, creates no new crime. It does not seek to extend the territorial jurisdiction of the criminal laws of the state. "It is concerning the crime of murder in cases where the stroke and death happen in different counties." It provides that the jurors where the stroke happens, may indict, whether the coroner view the body or not. It alters the machinery of the common law in this particular, and it is an act "concerning murder, where either the stroke or death only happens within this state."

Concerning the commission of the crime of murder, where only the stroke or death happens within this state, it provides that if any person shall be feloniously stricken within the jurisdiction of this state, and shall die of such stroke, out of the jurisdiction of the state, he may be indicted by the jurors where the stroke was given, without view of the body by the coroner. It is an act, therefore, which concerns murder, a known crime against the laws of New Jersey, which does occur where the party dies out of the state.

In *Commonwealth* v. *Macloon*, 101 *Mass.* 1, it was held,

after a thorough review of the cases, that a citizen of another state, or of a foreign country, may be convicted of manslaughter of a person who dies within the commonwealth, of injuries inflicted upon him by the accused, in a foreign merchant vessel, upon the high seas.

If Judge Gray is correct, there can be no possible question of the power of the legislature to pass such an act, which is all we are required to show. But we are not required to rest this case on the soundness of the decision in the Macloon case, nor to insist on the power to punish offences which occur outside of the area over which the authority of the laws of New Jersey extends. We do not think such a proposition can be maintained, and are, therefore, unwilling to rest this case upon it, no matter how high the authority may be upon which it rests. The doctrines of the courts of New Jersey are in accord with the courts of Great Britain, on this important question. Great Britain has never asserted such a right, but only to punish such offences as occurred outside of Great Britain, but within the admiral's jurisdiction; and the admiral's jurisdiction, in this country, is vested by the constitution in the federal government. The states are sovereign, but not independent. Mr. Wheaton says it is evident that a state cannot punish an offence against its municipal laws, committed within the territory of another state, unless by its own citizens. *Lawrence's Wheat.* 230; *Story on Const.* 618; 5 *Wheat.* 416; *United States* v. *Pirates,* 5 *Wheat.* 197; *United States* v. *Coombs,* 12 *Peters* 72; *Thomas* v. *Lane,* 2 *Sumner* 1; *United States* v. *Hamilton,* 1 *Mason* 151.

The constitution of the United States provides that "the trial of all crimes, except in cases of impeachment, shall be by jury, and such trial shall be held in the state where the crime shall have been committed, but when not committed within any state, the trial shall be at such place or places as the congress may, by law, have directed.' *Art. III.,* § 3; *Jackalow's case,* 1 *Black* 486.

It is provided by the crimes act, (*Rev. Stat. of U. S., p.* 138, § 730): "The trial of all offences committed on the

high seas, or elsewhere out of the jurisdiction of any particular state or district, shall be in the district where the offender is found, or into which he is first brought."

Now, in Great Britain, if a blow is struck on the high seas, but within the jurisdiction of the sovereign, the offender may be punished where the death occurs. In the United States, a stroke on the high seas, and death in a state, subjects the offender to be tried in such place as congress may designate. It is an offence against the sovereignty and laws of the United States, and for this reason, having occurred outside the jurisdiction of a state, is cognizable by the federal courts. Otherwise, there would be here, as in Great Britain, numerous cases where crimes against the laws of the state might occur within the admiralty jurisdiction, and they would be cognizable where the party died, and not where congress designated.

Crimes not committed in any state, may be defined to be—offences committed in the District of Columbia; in forts or arsenals to which jurisdiction has been ceded by the states; in the territories of the United States; in the Indian country; upon the high seas, and everywhere, when against the law of nations. *U. S. Act of* 1857; 2 *Cart. C. C.* 447; *Brightly's Dig.* 208; *McGill's case,* 4 *Dall.* 426; *Rev. Stat. of U. S.* 1043.

The position of the prosecution is precisely this—the statute requires that the stroke shall be feloniously given; that is, so given that the offender forfeits his fee to the Lord Paramount, or, in other words, so given that it violates the sovereignty of the state prosecuting, and under whose protection the victim was at the time. It follows that whenever the stroke is given in the state, and the death outside, the blow is felonious, and the act indictable; but when the stroke is outside, it is only felonious, and therefore only indictable where the doctrine of extra-territoriality extends the jurisdiction.

Chief Justice Cockburn says, in *Queen* v. *Keyn, L. R.,* 2 *Ex. Div.* 65: "In order to render a foreigner liable to the local law, he must, at the time the offence was committed, have been

within British territory, if on land, or on a British ship, if at sea. * * * According to the doctrine of Lord Coke, in *Calvin's case*, 5 *Coke*, protection and allegiance are correlative, or, as I prefer to put it, it is only for acts done when the person doing them is within the area over which the authority of British law extends, that the subject of a foreign state owes obedience to that law, or can be made amenable to its jurisdiction."

The case of Regina *v.* Lewis sustains the decisions of the Supreme Court of New Jersey precisely. 7 *Cox Cr. Cas.* 277.

A, a foreigner, died at L., in England, of injuries inflicted by B, also a foreigner, on board a foreign ship, whilst at sea. *Held*, that neither section eight or nine of *Geo. IV., ch.* 31, nor section one of 2 *Geo. II., ch.* 21, was applicable to the case, and that the English court at L. had no jurisdiction to try B for the offence.

2. Whether the letter and declarations of the deceased and the letter of the defendant were admissible. The letter and declarations of the deceased are admissible as a part of the *res gestæ*. They are not hearsay, but original testimony. They are declarations made at the time, of an act done, which derive a degree of credit from the act itself.

Where the state of mind, sentiment, or disposition of a person, at a given period, becomes a pertinent topic of inquiry, his declarations and conversations being part of the *res gestæ*, may be resorted to. *Roscoe's Cr. Ev.* 23, *and note; Barthelemy* v. *The People*, 2 *Hill* 248; *Lord Gordon's case*, 21 *Howell's State Trials* 535; 1 *Phil. on Ev.* 184; 1 *Whart. Law of Ev.*, § 259; 1 *Greenl. on Ev.*, §§ 108–110.

In *Lund and wife* v. *Inhabitants of Tyngsborough*, 9 *Cush.* 36, Judge Fletcher reviews the cases, holding that there must be a main or principal fact or transaction, and only such declarations are admissible as grow out of the principal transaction, illustrate its character, are cotemporary with it, and derive some degree of credit from it. *Wright* v. *Tatham*, 5 *Cl. & Fin.* 670.

Perhaps the most common and largest class of cases in which declarations are admissible, is that in which the state of mind or motives with which any particular act is done, is the subject of inquiry. Thus, where the question is as to the motives of a debtor in leaving his home and going and remaining abroad, so as to determine whether or not an act of bankruptcy has been committed, his declarations, when leaving his home and while remaining abroad, as to his motives for leaving his home and for remaining abroad, are admissible in evidence. Such declarations accompanying the act, clearly belong to the *res gestœ.*

In *Queen* v. *Gandfield,* 2 *Cox Cr. Cas.* 43, Erle, J. says: " Conversations that explain a man's conduct, are admissible in evidence." *Haile* v. *State,* 1 *Swan (Tenn.)* 248; *State* v. *Zellers,* 2 *Halst.* 275.

On the trial of Ephraim K. Avery for the murder of Sarah M. Cornell, before the Supreme Judicial Court of the State of Rhode Island, May 6th, 1833, Chief Justice Eddy presiding, a paper in pencil mark, containing these words :

" If I am missing, inquire of Rev. Mr. Avery, Bristol— he will know where I am—

" Dec. 20th,                                  S. M. CORNELL,"

was admitted by the court and read to the jury. See page 57 of trial, as reported by Marshall & Brown, of Providence.

In the case of Webster, for the murder of Parkman, the inquiries of Parkman of Little as to the condition of Webster's account in the bank, were admitted, after objection, by Chief Justice Shaw. *Webster's case, by Bemis, p.* 161, *also pp.* 463, 464, where, in the charge, he presents to the jury, for their consideration, the inquiries made by Parkman, as he rode through the streets of Cambridge, for Dr. Webster's house.

The declarations of a physician, on leaving home, taking medicines with him, as to the place to which he was going, and the purpose of his visit, are admissible evidence on the principle of *res gestœ. Autauga County* v. *Davis,* 32 *Ala.*

704; *Pitts* v. *Borroughs*, 6 *Ala.* 733; *Olds* v. *Powell*, 7 *Ala.* 652; *Kinzer* v. *Mitchell*, 8 *Barr* 64; *State* v. *Howard*, 32 *Vt.* 380.

It sometimes happens that a declaration is evidence for a particular purpose, though it is not to be taken as evidence to prove the truth of the fact declared, for the rule seems to be that, if the declaration be evidence as a circumstance in the cause for any purpose, it is to be received. *Stark. on Ev.* (*9th ed.*) 88.

The letter to his wife, and statements made to his son by Armstrong, are admissible, if only to characterize the motive which he had when he moved—he intended to go to Camden; he intended to meet Hunter, and go with Hunter. Although it may not prove that he went to Camden (that is proved *aliunde*), this testimony is admissible to characterize it. *Mitchum* v. *State*, 11 *Geo.* 615; *Luse* v. *Jones*, 10 *Vroom* 708.

The nineteenth exception is to the relevancy and competency of the following letter of the prisoner:

"No. 710 Sansom Street,  
Philadelphia, Dec. 3, 1877.  

" Please call at the Manhattan Life Insur. office, 414 Wal. street, between 12 & 1 o'clock, to be examined.

"And also call at the Provident, between 1 & 3, 108 S. 4th, for same purpose.

"I will put it in two companies.

"You will oblige me by attending to both to-day, and I will call on them to-morrow.

"Resp'y yours,       Benj. Hunter.

" To John M. Armstrong, 710 Sansom St.

" N. B. Leave off your truss, for fear they would decline to insure you.       B. H."

The theory of the prosecution was that the motive which induced the commission of the crime, was to obtain the amount of the insurance. In reference to this matter, there was abundant testimony. The letter goes to show Hunter concerned in procuring the insurances, and tends, at least, to

bring home to him a desire that Armstrong should be insured. It was both relevant and competent as the admission of the party against himself.

3. Whether the testimony of the wife of Thomas Graham, an accomplice, was properly admitted to corroborate her husband. *King* v. *All Saints*, 6 *Maule & Sel.* 194; *Stewart* v. *Johnson*, 3 *Harr.* 94; *Roscoe's Evidence, p.* 114; *State* v. *Wilson and Wagner*, 2 *Vroom* 79; *Ware* v. *State*, 6 *Vroom* 553; *Haskins* v. *The People*, 16 *N. Y.* 344; *Reg.* v. *Haloday*, 8 *Cox Cr. Cas.* 298; *State* v. *Drawdy*, 14 *Rich. S. C.* 87; *Thompson* v. *Commonwealth*, 1 *Metc.* (*Ky.*) 13; *Cornelius* v. *Commonwealth*, 3 *Metc.* (*Ky.*) 481; *State* v. *Burnside*, 37 *Mo.* 345; *Commonwealth* v. *Manson*, 2 *Ashmead* (*Pa.*) 31; *Workman* v. *State*, 4 *Tenn.* 425; *State* v. *Anthony*, 1 *McCord* 286; *Fisher* v. *Filbert*, 6 *Barr* 69.

Exception twenty-two is to the refusal of the judge to charge that the evidence of the accomplice should be corroborated, not only in the details of the crime and the circumstances which surround it, but also as to the statements which related to the person of the accused, and his being present at the killing.

There was no error in this refusal. There is no such principle in the law of evidence as the request indicated.

In Haskin v. The People, Chief Justice Denio says: " As is above shown, it would not have been error, and the prisoner would have had no legal cause of complaint, if the jury had been instructed on the uncorroborated evidence of the accomplice.

But this matter has been settled by the Supreme Court of this state, in the case of *State* v. *Hyer*, 10 *Vroom* 598, where it was held that, " although the practice of courts is to advise juries not to convict a defendant on the uncorroborated testimony of an accomplice, yet, a conviction founded on such evidence, is strictly legal. That being a matter of discretion with the judge who tried the cause, errors could not be assigned on the refusal."

*George M. Robeson,* in reply.

The whole argument, on the part of the state, seems to be on the idea of a *new offence* created by this statute, not before known to New Jersey.

1. Did our statute undertake to make a *new* crime.

The English statutes on which it is founded did not and have never been held to have done so.

All the construction given them has been on the principle that they referred to crimes already existing, of which English law could take cognizance.

2. This act in its language does not undertake to define and establish a new crime. It refers to crimes already recognized and characterized in our statute books.

3. If no new crime was created, then to make the statute apply to this case, you must hold that the legislature *intended* and *did* by this statute undertake to prescribe the means·for the trial of offences, the material parts of which occurred· in another *exclusive* jurisdiction.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The plaintiff in error was convicted of murder in the first degree before the Court of Oyer and Terminer of the county of Camden, and by the authority of the recent statute relative to writs of error in capital cases, certain parts of the proceedings at his trial have been brought before this court for revision. I shall notice briefly each part thus presented, in the order in which they stand in the printed points laid before the court by his counsel.

The first and second of the objections thus made to these proceedings are of the same character and rest on the same ground, and may be disposed of conjointly and in a word. They relate to alleged defects in the first and sixth counts of the indictment, but as there is and can be no pretence that some of the other counts are not good, it would be useless for

present purposes to consider what weight there is in such exceptions, for it has long since been authoritatively established by judicial decisions in this state, that a single good count in an indictment is sufficient to sustain the judgment. *West* v. *State*, 2 *Zab.* 236, and the cases there cited.

The third, fourth, and fifth exceptions relate to but one subject, presenting it in different aspects, and under varied forms of objection. The point raised is this : That in two of the counts of the indictment the death of John M. Armstrong is laid as having occurred in this state, while in each of the other four counts there is an averment of his death in the State of Pennsylvania. Upon this it is objected, in the language of counsel, that "this is not a different form of averment of the same crime, but the two classes of counts directly and positively aver two different things, which are impossible to be the same, namely, the first and sixth, the death of John M. Armstrong, who died in the State of New Jersey, and the remaining four counts, the death of John M. Armstrong, who must have been a different person, since he died in the State of Pennsylvania. There is no word used in any of the counts to show that the same Armstrong is meant in each, but the counts are kept specially distinct by the designation in each as one John M. Armstrong. This shows an indictment containing two distinct charges of felony and murder done by the prisoner upon two different persons. This makes the indictment multifarious, incongruous and bad."

If it were admitted that this record, in conjunction with the general verdict of guilty, imports all that is claimed in this contention, it is not apparent why, on this writ of error, the judgment should be reversed. If the plaintiff in error has, in truth, murdered two men, instead of one, there seems no reason why the present sentence should not stand. It is indeed urged in behalf of the prisoner, that by this mode of treatment he has been put to disadvantage in the loss of the right to challenge double the number of jurors that can be challenged when the crimination is single; but the reply to this is, that this record does not show that he claimed such

right, or that it was withheld from him; for aught that appears, he may have exercised it. But, independently of such considerations, there can be no doubt as to the rule of law applicable to the subject, for it always has been held that the only mode of objecting to the joinder of several distinct felonies in one indictment is by a motion to the trial court, before plea, to quash the indictment, or in a subsequent stage of the proceedings to apply to compel the prosecutor to elect which charge he will try; and it is further settled that the decisions on such motions are not subject to review on error brought. But at this time I do not think it is necessary to further pursue this line of inquiry, or to conclude anything involved in it, inasmuch as it is clear that it is only by a misconstruction of the legal form of this record that any of the questions embraced in this exception can be considered to be legally presented. These several counts are mere formularies, having a fixed and certain legal efficacy. Each several count, in a well drawn indictment, imports, according to its terms, a charge of a distinct offence, and there is no inter-dependence exhibited, in anywise, between the several counts. Thus, in charging a homicide, one count may lay the killing to have been done with an axe; another may allege that the instrument used was a knife, and a third may describe it as a sword. The act of killing is thus differentiated by descriptive *indicia*, so that, read literally, such counts are always incongruous; but their literal sense is not their legal sense. They are regarded in law as charging, in substance, the same offence, the incidents only being varied for the technical purpose of harmonizing, even in details, the described crime with the possible proofs. The offence is no more marked and individualized by a description of the place of death, than it is by a description of the instrument used. And this question, like those already disposed of, is also *res adjudicata* in our courts. The whole subject was considered and adjudged in the case of *Donnelly* v. *State*, (first in the Supreme Court and afterwards in this court,) 2 *Dutcher* 461, 601. On that occasion, Mr. Scott, who appeared for the prisoner, insisted that

each of the four counts in that indictment charged a distinct offence, and that the general verdict was so incongruous that it found that the slain man had been murdered and had died four times on the same day. But the court, looking beyond the mere form, and recognizing its object and purpose, held that the four counts charged but a single offence.

This decision rules the present question, as the principle on which it rests is plainly applicable.

The next two exceptions pertain to certain declarations, both written and oral, which are alleged to be mere hearsay, and which, therefore, it is urged, were inadmissible.

The question thus raised is of importance, and in some of its aspects its decision is attended with considerable difficulty.

In pressing this matter on the attention of the court, this is the printed language of the counsel of the defendant: "Sixth. The court erred in admitting the declarations of John M. Armstrong, made in Philadelphia, on the afternoon of the twenty-third of January, to the effect that he intended to go that evening to Camden, in company with Mr. Hunter, said declarations not being dying declarations, nor made in the presence of Hunter, nor under any circumstances which made them competent as evidence in this case."

It will be observed, from this statement, that the whole objection here made is to the statement that the deceased said he was going to Camden with Mr. Hunter on the night in question. Upon turning to the proceedings at the trial and the bill of exceptions, it appears that the statement of the witness, with reference to the matter in question, was fuller, and contained other particulars than those above indicated. The witness was the son of the murdered man ; and, narrating the statements made to him by his father, his words were as follows : "He said, in the morning, that Mr. Hunter had told him that some one had told him (Hunter) that Davis had a bank account, and that he had advised my father to come over and see about it, and get the money, and he would go with him. Father said he intended to go with Mr. Hunter, and he and Mr. Hunter were going to Camden that night."

Following this statement of the witness, the bill of exception proceeds in this form, viz. : " To which testimony counsel for the prisoner there and then objected, and moved and contended that the same was mere hearsay testimony, and should be overruled ; but the court thereupon denied the motion, and refused to overrule the said testimony, or any part thereof."

From this presentation it appears that this entire statement of this witness was objected to as a whole ; there was no attempt to separate it into parts, discriminating the bad from the good, so that, until this had been done, the court could not be required to do it, but was right, if the statement contained in any respect legitimate evidence, in refusing to overrule it or any part of it. The rule on the subject is settled beyond all controversy, and has been frequently acted upon by this court. If, consequently, the narration of the witness, to the effect that his father told him that he and Mr. Hunter were going to Camden that night was unobjectionable evidence, this action of the judge in refusing to overrule the entire statement cannot be impeached. I think there can be no doubt that this latter declaration was the particular to which the attention of the court and the counsel was directed at the trial, and that the objection then made was pointed at it exclusively. It was certainly the exclusive subject, so far as touches the testimony of this witness, of the printed exception on the part of the defence, and was the foundation on which was rested the well digested and very forcible argument which the counsel of the prisoner addressed in his behalf to this court. From these circumstances I have concluded that the question whether this witness should have been allowed to declare what his father had said touching the Davis book account is not now legally presented for consideration. I shall therefore treat this part of the case as it was treated by the counsel of the prisoner in his argument here, as raising the single inquiry whether the witness could be allowed to testify that his father told him he was going to Camden with the plaintiff in error on the night of the murder. I may

remark, however, in this connection, that in the sequel it will appear that the permitted reference by this witness to the Davis account seems to me, from one of the views I take of the questions involved, a circumstance of no importance.

Connected with this subject, and raising questions controlled by the same considerations, is the testimony called in question by the seventh exception.    This was a letter written by John M. Armstrong to his wife, on the afternoon preceding the night of his murder, which was in these words, viz.: "No. 710 Sansom street, Philadelphia.    I will not be home much before nine o'clock.    Am going over to Camden again with Mr. Hunter, on business connected with the Davis matter. (Signed) John M. A.

"Frank will not be at home to supper; he is going down to Goudey's to tea."

The person here described as Frank was the son of Mr. Armstrong.    The envelope containing this note was addressed to his wife.

The conversation with the son, embraced in the foregoing exception, occurred in the afternoon of the day of the murder, the letter being sent at a later hour of the same afternoon.

From the foregoing statement of facts it will, I think, be apparent that the particular question to be at present resolved, is, whether these communications of Mr. Armstrong, whether written or oral, of his intention of going to Camden with Mr. Hunter, were, in a legal view, to be regarded as a part of the *res gestœ*.    The peculiar features of this case affecting this question will be hereafter considered by me; but I think it is obvious that, with reference to general legal principles, such communications were no part of the matter in controversy, unless they were so connected with the act of the deceased in going to Camden as to be, in a reasonable sense, part of such act.

Now I think I may safely say that there are few problems involved in the law of evidence more unsolved than what things are to be embraced in those occurrences that are designated in the law as the *res gestœ*.    The adjudications on the

subject, more especially those in this country, are perplexingly variant and discordant. I can readily find judicial rulings by force of which this testimony would be excluded ; but I can as readily find other rulings of equal weight, that would sanction its admission. This result has grown out of the difficulty of applying, with anything like precision, general rules to a class of cases of infinite variety. In the well considered case of *Lund and wife* v. *Inhabitants of Tyngsburgh*, 9 *Cush.* 42, it is said : " The *res gestœ* are different in different cases ; and it is, perhaps, not possible to frame any definition which would embrace all the various cases which may arise in practice. It is for the judicial mind to determine, upon such principles and tests as are established by the law of evidence, what facts and circumstances, in particular cases, come within the import of the terms." In the present instance the test thus indicated will be found, I think, in the rule that such declarations as these are admissible, because they are so connected with an act, itself admissible as a part of the *res gestœ*, as to have become incorporated with it. The declaration and the act must make up one transaction. The theory justifying this course is that, when such declarations are thus coupled with a provable act, they receive confirmation from it ; but if they stand alone, without such support, they depend altogether for their credence on the veracity of the utterer, and thus conditioned, they are pure hearsay, and inadmissible. Alluding to the rule that excludes hearsay, Mr. Starkie, vol. I., p. 65, says : " The principle does not extend to the exclusion of any of what may be termed real or natural facts and circumstances in any way connected with the transaction, and from which any inference as to the truth of the disputed fact can reasonably be made." The present point of inquiry therefore is, whether these declarations of Mr. Armstrong to his son, and the similar declaration contained in the note to his wife, can reasonably be said to be component parts, or the natural incidents of the act of the deceased in going to Camden, which act was incontestably a part of the *res gestœ*. After mature reflection and a careful examination of the

authorities, my conclusion is, that these communications of
the deceased should be regarded as constituents of that trans-
action, for I think they were preparations for it, and thus
were naturally connected with it.   In the ordinary course of
things it was the usual information that a man about leaving
home would communicate for the convenience of his family,
the information of his friends, or the regulation of his business.
At the time it was given, such declarations could, in the
nature of things, mean harm to no one ; he who uttered them
was bent on no expedition of mischief or wrong, and the atti-
tude of affairs at the time entirely explodes the idea that such
utterances were intended to serve any purpose but that for
which they were obviously designed.   If it be said that such
notice of an intention of leaving home could have been given
without introducing in it the name of Mr. Hunter, the
obvious answer to the suggestion I think is, that a reference
to the companion who is to accompany the person leaving, is
as natural a part of the transaction as is any other incident
or quality of it.   If it is legitimate to show by a man's own
declarations that he left his home to be gone a week, or for a
certain destination, which seems incontestable, why may it
not be proved in the same way that a designated person was
to bear him company ?   At the time the words were uttered
or written, they imported no wrong-doing to any one, and
the reference to the companion who was to go with him was
nothing more, as matters then stood, than an indication of
an additional circumstance of his going.   If it was in the
ordinary train of events for this man to leave word, or to
state where he was going, it seems to me it was equally so
for him to say with whom he was going.   I think Mr.
Wharton has well described that assemblage of acts and their
incidents, that make up the *res gestœ*.   He thus writes : " The
*res gestœ* may therefore be defined as those circumstances
which are the undesigned incidents of a particular litigated
act, which are admissible when illustrative of such act.   These
incidents may be separated from the act by a lapse of time
more or less appreciable.   They may consist of speeches of

any one concerned, whether participant or bystander; they may comprise things left undone as well as things done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary, in this sense, that they are part of the immediate preparations for, or emanations of such act, and are not produced by the calculated policy of the actors." This definition obviously embraces the declarations now challenged, for they were immediate preparations for the act in question, and were certainly not produced by the calculated policy of the actor who gave utterance to them. I am unable to see that the reference made to Mr. Hunter by the deceased was not as closely combined with the probable act of his going to Camden, as were the inquiries made by Parkman, as he passed through the streets of Cambridge, for the house of Dr. Webster; and those inquiries were admitted as evidence by Chief Justice Shaw. *Report of Webster's case.* It is true that in that instance the inquiries happened to be precisely cotemporaneous with the act being done; but all the authorities admit that it would be absurd to require exact coincidence in point of time between the doing of the act and saying of the words explanatory of it. Thus, in the case already cited from 9 *Cushing*, it is said: "So declarations, to be admissible, must be cotemporaneous with the main fact or transaction; but it is impracticable to fix, by any general rule, any exact instant of time, so as to preclude debate or conflict of opinion in regard to this particular point." Lord Denman is quite strong in his expressions on this subject, for in *Rouch* v. *Great Western R. R. Co.*, 1 *Q. B.* 60, he uses this language: "The principle of admission is, that the declarations are *pars rei gestœ*, and therefore it has been contended that they must be cotemporaneous with it; but this has been decided not to be necessary, on good grounds; for the nature and strength of the connection with the act are the material things to be looked to; and, although concurrence of time cannot but be always material evidence to show the connection, yet it is by no means essential." In the case now under consideration, these

declarations are so naturally, and therefore strongly, associated with the act in contemplation that, in my estimation, the most exact cotemporaneousness of the two things would give no additional force to the connection between them. There is nothing in the case to countenance the notion that any change of purpose occurred between the time of the expression of such purpose and the execution of it, so, as there is no extraneous interference, the disclosure of the intention and its performance may be said to be, within the meaning of the authorities, one entire transaction.

It is principally from the foregoing considerations that I find myself constrained to think that the declarations under discussion, even if they stood in the case unsupported or unaffected by other circumstances, were admissible, on general principles, on the single ground that they were the natural and inartificial concomitants of a probable act, which itself was a part of the *res gestœ*. In such a *status* of the evidence, I should think that the exception to the principle that rules out hearsay, had been carried to its extreme limit, but without transcending such limit.

But, in point of fact, the question thus discussed is not, on this record, presented in this narrow point of view, for it is, in the proofs, connected with facts that appear to put the admissibility of these declarations on a stable foundation.

. It was in the connection now to be disclosed, that this testimony was admitted by the judge at the trial.

A witness for the state had been produced, who had testified that he had overheard a certain conversation, that had occurred on the day of the murder, between the victim, Mr. Armstrong, and the defendant, Mr. Hunter. This witness, referring to the latter person, said: "I saw him in the office, talking to Mr. Armstrong. * * * I heard him say, This man has a bank account; I heard it from 'private,' or 'outside' parties; I do not know which; you go there to-night, at seven o'clock, and I will go with you." Here, then, it appeared that Mr. Hunter made an offer to go with the deceased. It was certainly competent to show that there was a mutual understand-

ing to that effect, and the evidence in question was admitted with that view, and for that single purpose. Whether the deceased acceded to the plan proposed to him, was known to himself, but his purpose could be made manifest to others only by his words. Otherwise than in this way, how was it possible to show the assent of the deceased to the proffered arrangement? Suppose the defence had shown that a proposition had been made by some third party to accompany the deceased to Camden, on the night in question—could it have been reasonably contended that such evidence could not have been supplemented, and made significant, by proof that the deceased evinced, by his statements, that he, on his side, had agreed to the proposal, and was about to carry it into effect? In this aspect of the evidence, the case seems to be brought fully within that other exception to the rule excluding hearsay, which legalizes declarations which are explanatory of a state of mind, such mental condition being the subject of inquiry. In the case of Lund v. Inhabitants of Tyngsburgh, already cited, the principle which is apposite is stated in these terms: " Perhaps the most common and largest class of cases in which declarations are admissible, is that in which the state of mind, or motive with which any particular act is done, is the subject of inquiry. Thus, where the question is as to the motives of a debtor in leaving his house, and going and remaining abroad, so as to determine whether or not an act of bankruptcy has been committed, his declarations when leaving his house and while remaining abroad, as to his motives for leaving his house and for remaining abroad, are admissible in evidence. Such declarations, accompanying the act, clearly belong to the *res gestæ*. They are calculated to elucidate and explain the act, and they derive a degree of credit from the act." This, undoubtedly, is a correct statement of the legal doctrine, and it seems completely applicable to this case in the present point of view. One of the important questions at the trial was, whether the deceased had come into an agreement with the defendant to accompany him to Camden on the night of the murder. There was testimony

showing the assent of Mr. Hunter to such agreement. The question for solution was as to the intention of the deceased in leaving his home, whether his motive and purpose were to assent to and execute such agreement. Such a juncture, with respect to intention and conduct, I cannot distinguish from that of the bankrupt in departing from his home, so far as the rules of evidence touching declarations are concerned; and, in my opinion, this testimony, on this ground, was also admissible.

In this connection, it is proper that I should say that I have examined the testimony of William L. Donnell, and that I have found it of the same general character as that just considered, and that, in its principal features, I think it is to be controlled by the principles already laid down. It does not refer to Mr. Hunter by name, but the witness says that the deceased told him that a certain party had told him that Davis "had money in bank, and they were going over to see about it." The witness further said the deceased told him that he "had been over the night before," but this statement had no significance in the case. In view of the admission of the other declarations which so directly referred to the defendant, and his arrangement with the deceased, the testimony of this particular witness was of no consequence in the case; and that was the estimation apparently put upon it by the counsel of the defendant, for it was scarcely alluded to in his exhaustive argument on this branch of the controversy.

I have already shown that I have been led to the result that all these declarations which were excepted to as hearsay, were legitimate evidence in the cause; and I have now to make the further remark, that if I had arrived at the opposite conclusion, I still should not have felt justified, on that account, to vote in favor of reversing this judgment. My reason is this, that I am satisfied that the admission of this testimony could not have hurt the defendant on the trial of the cause, and by force of the law of this state it is not enough, for the purpose of overthrowing a judgment in a criminal case, that errors in law have entered into the proceeding. The

eighty-ninth section of the statute regulating criminal pro-
cedure says : " No judgment given upon any indictment shall
be reversed for any imperfection, omission, defect in, or lack
of form, or for any error except such as shall or may have
prejudiced the defendant in maintaining his defence upon the
merits."    In addition to the existence of error in law, it
must be shown that such error was, or might have been, pre-
judicial to the defence on the merits.    This exposition of the
statute was applied in the case of *Donnelly* v. *State*, 2 *Dutcher*
493.

And from a careful examination of this case, I have fully
satisfied my own mind that all the facts embodied in these
disputed declarations appeared from indisputable testimony, so
that they stood in the case as undisputed facts.    That the
deceased *said* that he and Mr. Hunter were to go to Camden
on the night in question, with respect to the Davis account, I
find conclusively established, irrespectively of these reported
statements made by the deceased, the admissibility of which
has been denied.    I will turn to the evidence for the purpose
of seeing that it appears in an undisputed form, and without
contradiction, that the deceased said these things.    In the first
place, I will refer to the son of the deceased, Mr. Armstrong.
This witness says he told Mr. Hunter, the day succeeding the
murder, what his father had said to him touching his going
to Camden.    His language is : " He (Hunter) came to the
dining-room, and I told him father had been assaulted in
Camden ; I asked him if he had been along with father ; he
said no ; I told him that father had told me that he was going
over to Camden with him that night, and he said he did not
say so—that it was not so."    And on the cross-examination
of this witness, the further important testimony was elicited :
the counsel of the defendant, referring to a statement made
by the witness on a previous occasion, asked this question :
" Then how is it that you said that reference was made to
Davis' bank account before ?"    Answer—" I forgot that."
Question—" What else occurred that you have not told us
now ?"    Answer—" I said Mr. Hunter thought that perhaps

this party that had told him that Davis had a bank account had proven treacherous." And further on, referring to the statement of the witness to Mr. Hunter, that his father had told him that he was going to Camden with him, the cross-examiner proceeds thus : "And you told him that perhaps the party who had told him that Davis had a bank account had proved a traitor?" Answer—"Yes, sir." Question— "That is to say, you made it up?" Answer—"No, sir; I did not make it up." Question—"Where did you get the information?" Answer—"Because my father had told me that Mr. Hunter had told him." Here, then, we have a witness distinctly swearing to all the material facts comprehended in the disputed declarations, in a form that was unquestionably legal. He here testified to his information from his father that Mr. Hunter was to go with him to Camden, and that such visit related to the Davis account. Further than this, in the defendant's own testimony, when a witness in his own behalf, he says, referring to the interview with the son of the deceased : "He told me that his father had been assaulted in Camden, and he asked me if I was there; I told him I was not; he intimated to me—in fact said to me—that his father said I was going with him to Camden, and through the conversation he said I would have to locate myself." So, with respect to the same theme, being called for an explanation of an alleged conversation with Mr. Lorrilliere, he further testified : "Well, I said something to this effect, I think : that I was very sorry to hear about the trouble of Mr. Armstrong ; that he had said I was over there that night, or something to that effect." There was also further evidence on the point. The widow of the murdered man was a witness, and she narrated a conversation she had with Mr. Hunter on the morning after the murder, and told him, in the course of it, that she had received a note from her husband on Wednesday evening, stating that he was going to Camden with him in the evening; and then the cross-examination follows, in this wise : Question—"Had Mr. Armstrong told you that Mr. Hunter was going over with him on Tuesday, also?" Answer—"He

told me on Tuesday morning, early." Question—"What did he tell you?" Answer—"He said he would not be home that day, on Tuesday evening; he was to have taken his papers concerning the Davis matter with him, and Hunter would go with him, and he would be back about nine o'clock."

Now this mass of testimony, proving the fact that the deceased did say that the defendant was to accompany him to Camden on the night of the murder, stands in the case absolutely unquestioned either by word or circumstance. These statements may not have been true; Mr. Hunter may not have arranged to go to Camden with him; but that is not the point; the question was, whether the deceased so asserted; and that, I repeat, I consider was absolutely indisputable, in view of the admittedly legal evidence. The contested declarations, therefore, were mere surplusage; they did, and could do, neither harm nor good to either side. To overturn this judgment, therefore, on this ground, would be, in my judgment, to overturn it on a mere technicality. To do so would be to contravene the provisions of that wise and valuable statute which has just been recited.

On the whole, therefore, I think it clear that these particular exceptions are not well taken.

The tenth assignment of errors is in these words, viz.: "The court erred in admitting Lydia Graham, wife of Thomas Graham, to be sworn and give testimony in corroboration of the statement and confession of her husband, that he had been guilty of the infamous crime of murder."

Thomas Graham, the husband of this witness, was the alleged accomplice of the plaintiff in error, and having been called as a witness by the state, had admitted his guilt as the associate of Mr. Hunter in the homicide. Subsequently, in the progress of the trial, the wife was offered as a witness, and was admitted after objection.

All that the wife testified to was, that just before the murder Mr. Hunter had called to see her husband, and on one of such occasions had left a card containing a request that the

husband would meet him at a designated place in the city of Philadelphia.

It appeared in the case that the husband had been separately indicted for this murder, and had not, at the time of the trial, pleaded to the accusation.

This objection was not much pressed on the argument, and it is plain, on all the authorities, that it cannot be sustained. It is altogether settled that the wife is a competent witness, when the husband is not a party in the suit, to testify to facts that merely tend to his crimination, provided the facts proved by her do not manifest that an indictable offence has been committed by him. This was the rule that received the sanction of this court in the case of *Ware* v. *State,* reported in 6 *Vroom* 554.

This exception, I think, should be overruled.

The eleventh and last exception is thus expressed : " The judgment in this case ought to be reversed because John M. Armstrong, who is alleged to have been murdered by the prisoner, died out of the State of New Jersey and in the State of Pennsylvania, and within the separate territory and exclusive jurisdiction of the said State of Pennsylvania."

The question thus raised for consideration is one relating entirely to the meaning and effect of one of the statutes of this state, and it was so treated by the counsel of the plaintiff in error in his argument addressed to this court. For his contention was, that by the rules of the common law, and except for statutory aid, the conditions of the case being a felonious and mortal blow within the territory of this state, and the occurrence of the resulting death beyond the limits of such territory, the criminal act could not be treated and punished as murder within this jurisdiction. It is not necessary that I should either assent to, or controvert, these premises, and for the present I shall proceed upon the assumption of their truth, and shall regard the inquiry as dependent for solution on the proper interpretation of the act under the rules of statutory exposition. And I may say at once, that in this point of view I have from the first failed to see the least difficulty in the subject. The language of this statute is this :

" Where any person shall be feloniously stricken or poisoned upon the sea, or at any place out of the jurisdiction of this state, and shall die of the same stroke or poisoning within the jurisdiction of this state, or where any person shall be feloniously stricken or poisoned within the jurisdiction of this state, and shall die of such stroke or poisoning upon the sea or at any place out of the jurisdiction of this state, in either of said cases," &c., jurisdiction is given to the courts of this state to try and punish such murders.

Now it will be at once observed that this clause of this law, interpreted by its own terms, has a meaning perfectly clear and definite. It describes with faultless accuracy of phraseology the place in which the jurisdictional facts are to occur ; the mortal blow is to be struck " within the jurisdiction of this state," in the one case, or " upon the sea, or at any place out of the jurisdiction of this state," in the other ; and the same words define the places in which the death is to happen. Why, then, should not this act be understood and enforced according to its plain import? The only reason which has been suggested is, that when the body of the crime has been committed within the territory of any of the other states of this Union, or in a foreign country, it is contrary to fundamental legal principles for this state to assume a jurisdiction over such offence merely from the fact that the victim of the crime died within such jurisdiction ; and it is therefore argued that the act should receive such a construction as will exclude from its operation such a result. The sense in which it was urged that the terms descriptive of the foreign places in which the homicidal blow was to occur were to be interpreted was, that they should be taken to indicate only such places as were out of the dominions of every organized government. The argument, then, having reached this point, was turned to practical application by the further contention that, as the terms descriptive of the place of the blow and of the place of the death were the same, that the latter occurrence, as well as the former, must happen outside of the reign of law, and as the death in this case took place within the

Commonwealth of Pennsylvania, the consequence was that the conjuncture to which the statute applied was not present, and therefore the courts of this state were destitute of jurisdiction to try the offence.   It will be perceived that the premise of this train of reasoning is, the inference that the statute, construed according to its terms, leads to an enormity,. that is, to the arrogation by the state of the prerogative of punishing offenses against the laws of foreign governments.. There can be no doubt that the spirit of a statute will sometimes control its letter, but when the letter is plain, the reason must be most cogent for departing from it.   I am unable to perceive on what ground it can be claimed that such reason exists in this case.   A claim to jurisdiction over extra-territorial crimes from the fact that the death, resulting from such crimes, occurred within such jurisdiction, has been decided by courts whose decisions are entitled to the highest respect, to be a legitimate exercise of the powers of government.   Such was the result reached, after an elaborate examination of the subject, by the Supreme Court of Massachusetts, in the case of *Commonwealth* v. *Macloon*, 101 *Mass.* 1 ; and the English statute is held by the courts of that country to give jurisdiction whenever an Englishman has committed a murder, the victim dying within the realm, although the fatal blow has been struck in a foreign country.   This doctrine was enforced in *Reg.* v. *Azzopardi*, 1 *C. & K.* 203, and was reaffirmed in a considered judgment, in the case of *Reg.* v. *Lewis*, 7 *Cox C. C.* 277.   It is therefore utterly out of the question to concede that a result thus accredited is to be considered so abnormal and monstrous as to raise a conviction that such result is not within the statutory intent, when the words of such statute are plain to that end.   I do not overlook the circumstance that there are some expressions used in the opinion read in the case of State *v.* Carter that may be said to tend in the direction of the opposite view ; but it is obvious from the context and general tenor of the judicial reasoning in that opinion, that the point really attempted to be sustained was

that the legislature was not invested with the ability to pass a law to punish foreign murders from the death of the person slain happening within the jurisdiction of the state. The case itself is no authority, even for such a doctrine, and what was said with reference to this matter was entirely extra-judicial, for the only question presented was, whether the act extended to the crime of manslaughter, and it was decided that it did not. But it is not with this question, or to the right of the legislature to pass a law of the kind referred to, that we are at present concerned; for no one denies that when the mortal blow, as in this case, has been struck in this state, such power exists; the only inquiry is, whether the legislature designed to enact such a statute. I have endeavored to show that its words are of plain import, and that there is nothing in the effects or consequences of the act by which the force of such words can be limited. I will remark, in conclusion, that if a corroboration of the foregoing view is necessary, it will, I think, be found by looking at the consequences of the statute in question if we adopt the exposition contended for by the counsel of the defendant. That exposition is that it was not the intention to punish crimes committed within foreign jurisdictions, and that when the statute speaks of any person being "feloniously stricken or poisoned upon the sea, or at any place out of the jurisdiction of this state," it is the necessary intendment that all foreign jurisdictions in which regular government prevails, are excepted. It is obvious, therefore, that with respect to the land when we search for a place within the statutory description, we are confined to desert lands, or the abodes of barbarous peoples; and with respect to the sea, as every ship, being subject to established law, is excluded by the definition, we have but the waste of waters in which the statutory blow is to be struck or the poison is to be administered. Manifestly it is safe to say this act was never intended to provide for the punishment of such impossible crimes. The statute must be read according to its terms, and in that sense it is applicable to the present case.

After full examination of all the points argued, I am of opinion that this judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DAL-RIMPLE, DEPUE, DIXON, KNAPP, REED, SCUDDER, VAN SYCKEL, CLEMENT, DODD, GREEN, LATHROP, WALES.    14.

*For reversal*—None.